

DEH/LJW: USAO2018R00215

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | **CRIMINAL NO.** CCB-19-0351 |
| **v.** | * | |
| | * | **(Honest Services Wire Fraud, 18** |
| **CHERYL DIANE GLENN,** | * | **U.S.C. §§ 1343, 1346; Travel Act, 18** |
| | * | **U.S.C. § 1952; Forfeiture,** |
| **Defendant.** | * | **18 U.S.C. § 981(a)(1)(C), 21 U.S.C.** |
| | * | **§ 853, and 28 U.S.C. § 2461(c))** |
| | * | |

**\*\*\*\*\*\*\***

## INFORMATION

## COUNT ONE
### (Honest Services Wire Fraud)

The United States Attorney for the District of Maryland charges that at all times relevant to this Information:

### Introduction

1.      The General Assembly was the State of Maryland's legislative body.  The bicameral legislature was composed of the Senate and the House of Delegates.

2.      The defendant, **CHERYL DIANE GLENN ("GLENN")**, was a Delegate in the Maryland House of Delegates, representing District 45, which covered portions of Baltimore, Maryland.  **GLENN** was the Chair of the Banking, Consumer Protection, and Commercial Law Subcommittee of the Economic Matters Committee; the Vice Chair of the Rules and Executive Nominations Committee; the Chair of the Baltimore City Delegation; and a member of the Women Legislators of Maryland Caucus and the Legislative Black Caucus of Maryland, among other memberships.

3.      The State of Maryland and its citizens had an intangible right to the honest services of its elected officials.  As a Delegate of the General Assembly, **GLENN** owed the State

of Maryland and its citizens a fiduciary duty to, among other things, refrain from soliciting and receiving bribes in exchange for taking, or agreeing to take, official actions.

*Relevant Individuals and Entities*

4. Associate 1 was an associate of **GLENN** and a businessperson in Maryland.

5. Associate 2 was an associate of **GLENN**.

6. Company 1 was a marijuana dispensing company, licensed in a state other than Maryland, which sought to obtain a license in Maryland to process and dispense medical marijuana in Maryland.

7. Businessperson 1 was the Chief Executive Officer of Company 1.

8. Businessperson 2 was an agent of Company 1.

9. Businessperson 3 was a Maryland resident and a businessperson.

10. Senator 1 was a senator in the Maryland State Senate.

11. Senator 2 was a senator in the Maryland State Senate.

12. Delegate 1 was a delegate in the Maryland House of Delegates.

*Maryland Medical Marijuana Legislation*

13. Since 2013, the General Assembly of Maryland has enacted legislation that resulted in the award of licenses permitting companies to grow, process, and dispense medical marijuana. **GLENN** was actively involved in sponsoring such legislation and in securing its passage. For example, **GLENN** was a sponsor of House Bill 1101, passed by the state legislature and signed into law by the Governor in 2013, which authorized access to medical marijuana in the State of Maryland for qualifying individuals and established the Natalie M. LaPrade Medical Cannabis Commission ("Commission"). **GLENN** was a sponsor of House Bill 881, passed by the state legislature and signed into law by the Governor in 2014, which set a

limit of fifteen licensed marijuana growers in Maryland.  **GLENN** was a sponsor of House Bill
490, passed by the state legislature and signed into law by the Governor in 2015, which
established requirements for the Commission to license medical marijuana processors in the
State of Maryland.

14.    In 2016, the Commission began the process of awarding fifteen medical
marijuana grower licenses and fifteen medical marijuana processor licenses in the State of
Maryland.

15.    House Bill 2, the "Natalie M. LaPrade Medical Cannabis Commission Reform
Act," increased the number of medical marijuana grower licenses from fifteen to twenty-two and
established a new cap of twenty-eight processing licenses.  House Bill 2 was pre-filed by
**GLENN** on September 25, 2017 and introduced on January 10, 2018.  House Bill 2 initially
passed the House by a vote of 121-16, with **GLENN** voting in favor, on March 8, 2018.  After
amendments from the Senate, House Bill 2 passed the House by a vote of 118-15 on April 7,
2018, with **GLENN** voting in favor.  It was passed by the Senate on April 9, 2018 and approved
by the Governor on May 15, 2018.

### Maryland Opioid Maintenance Therapy Regulations

16.    Maryland law governs opioid maintenance therapy programs involving the use of
pharmacological interventions to provide treatment, support, and recovery to opioid-addicted
patients.  Pursuant to this law and regulations promulgated by the Maryland Department of
Health, any such program was required to have a medical director who was a physician with at
least 3 years of documented experience providing services to individuals who are addicted to
alcohol or other drugs.

17.     House Bill 35, titled "Public Health – Opioid Maintenance Therapy Programs – Medical Director Requirement and Qualifications," amended this requirement so that a medical director of an opioid maintenance therapy program needed to be a physician with only 2 years of documented experience providing services to individuals who are addicted to alcohol or other drugs. House Bill 35 was pre-filed by **GLENN** on October 18, 2018, and introduced on January 9, 2019.

*Maryland Alcohol and Liquor License Legislation*

18.     Under Maryland law, alcohol licenses are divided into different classes. Class A licenses authorize their holders to sell, for consumption off the premises, beer, wine, and liquor six days per week. Class B licenses authorize their holders to sell beer and wine seven days per week and liquor every day except Sunday; certain Class B licenses were for consumption on the premises, while other Class B licenses had an off-sale privilege.

19.     House Bill 347, titled "Baltimore City – Alcoholic Beverages – Class B-D-7 Licenses," established an additional class B license within District 45, which was **GLENN's** District. **GLENN** requested that the Maryland Department of Legislative Services draft House Bill 347 on or about December 10, 2018, and it was co-sponsored by **GLENN** and introduced and on January 28, 2019.

**The Scheme**

20.     Beginning on or about March 4, 2018, and continuing through on or about February 11, 2019, in the District of Maryland and elsewhere, the defendant,

**CHERYL DIANE GLENN,**

and others known and unknown to the grand jury, devised and intended to devise a scheme and artifice to defraud and deprive the citizens of Maryland and the State of Maryland of the right to

4

the honest services of **GLENN** through bribery and the concealment of material information (hereinafter "the scheme to defraud").

### Purpose of the Scheme

21.     The purpose of the scheme to defraud was for **GLENN** to secretly use her official position as a Delegate to enrich herself by soliciting and accepting payments in exchange for taking, or agreeing to take, official actions.

### Manner and Means of the Scheme

22.     It was part of the scheme to defraud that:

23.     The defendant solicited and accepted cash payments totaling $33,750 from Associate 1 who served as a conduit for Company 1 and Businessperson 3.

24.     The defendant provided favorable official action for and on behalf of Associate 1, including, but not limited to:

    a.     Voting in favor of House Bill 2, which increased the number of medical marijuana grower and processing licenses that were available to an out-of-state company;

    b.     Promising to lead the effort to change the law in order to provide a preference for Maryland residency to in-state medical marijuana license applicants;

    c.     Introducing legislation that decreased the number of years of experience required to be a medical director of an opioid maintenance therapy clinic; and

    d.     Introducing legislation that created a class B alcohol and liquor license in District 45.

25.     The defendant took steps to hide, conceal, and cover up her activity and the nature and scope of her dealings with Associate 1 and others, including, but not limited to:

    a.     Agreeing not to deposit bribe payments in her bank account;

b.      Agreeing to meet in person to discuss the details of bribes rather than

discussing them over the phone; and

c.      Creating a false and fictitious loan note for a $15,000 bribe payment.

### Acts in Furtherance of the Scheme

*The First Payment*

26.      On or about March 4, 2018, during a phone call between **GLENN** and Associate

1, Associate 1 discussed Company 1's interest in obtaining a medical marijuana grow,

processing and dispensary license in Maryland.  During this phone call, **GLENN** told Associate

1 that she had an outstanding tax debt and **GLENN** and Associate 1 agreed that **GLENN** and

Associate 1 would solicit money from Company 1 to pay the tax debt in exchange for agreeing to

perform an official act.  **GLENN** agreed to meet with representatives of Company 1, including

Businessperson 1 and Businessperson 2, and said she would bring her tax bill of almost $3,000 to

the meeting.

27.      On or about March 5, 2018, **GLENN** met with Associate 1, Businessperson 1,

and Businessperson 2 at a restaurant in Annapolis, Maryland.  During the meeting,

Businessperson 1 expressed to **GLENN** that it was Company 1's desire to obtain a new license

pursuant to House Bill 2 that had been recently introduced, but not yet enacted.  **GLENN** took a

white, letter-sized envelope out of her purse and passed it to Associate 1.  The envelope

contained an outstanding property tax bill for **GLENN**'s residence in the amount of $2,716.

**GLENN** and Associate 1 agreed that **GLENN** would use her position as a state legislator to vote

for HB-2, which could favor Company 1 in its pursuit of a medical marijuana license.  **GLENN**

agreed to do so in exchange for a $3,000 cash payment from Associate 1 to **GLENN**, which

Associate 1 would attempt to obtain from Company 1.

28.     On or about March 6, 2018, Associate 1 and **GLENN** exchanged a series of text messages.  Associate 1 asked **GLENN**, "How did your bill go today?" and **GLENN** responded, "Better than expected, passed 2nd reader with NO amendments offered and no debate.  WOW!! 3rd reader tomorrow, then to the Senate."  **GLENN** later said, "I really hope you can get this done for me."  Associate 1 said, "I need your deposit slip and a check so there is no question who paid it.  That way everything is kosher."  **GLENN** asked Associate 1 to "pay it with cash".  Associate 1 responded, "I can do it with [Associate 2] or by myself but best with [Associate 2] so there isn't a connection.  [Businessperson 1] flies to r.i. tomorrow back to [name of city] sat.  Wires me $ Sunday then I'll contact [Associate 2]… do not fret, invoice is in my safe at home…only u me and [Associate 2] will know so stop worrying."

29.     On March 7, 2018, in response to a message **GLENN** had received from Associate 1 asking about the status of the bill, **GLENN** sent a text stating, "3rd reader tomorrow."

30.     On March 8, 2018, **GLENN** voted in favor of House Bill 2 on its Third Reading.

31.     On April 7, 2018, **GLENN** voted in favor of House Bill 2 after amendments from the Senate.

32.     On April 19, 2018, **GLENN** and Associate 1 spoke over the phone.  During the call, Associate 1 explained to **GLENN** that Company 1 was ready to make the $3,000 payment to **GLENN** because "[t]hey wanted to wait until everything went through the General Assembly."  **GLENN** arranged to receive the $3,000 the following day.

33.     On April 20, 2018, **GLENN** and Associate 1 met at a restaurant in Baltimore County.  During the meeting, Associate 1 handed **GLENN** $3,000 in United States currency. **GLENN** said, "[w]e passed the bill" and "I had to fight like hell.  You have no idea how I had to

7

fight." Associate 1 said, "[Businessperson 1 and Businessperson 2] appreciate you. What you did to get the pot. I mean, and they hope to get a license in Maryland." **GLENN** responded:

> Well let me tell you something - You let them know, and I'm serious . . . let them know there was a meeting with [Senator 1] right before *sine die*, on the medical marijuana bill ... and I wasn't invited to it and when I called [Senator 1's] office they said well Delegate **GLENN**, it's only for [Senator 1] and a few other Senators. So what I did, I went over to [Senator 2's] office and hung around 'cause I knew she was gonna be goin'. She took me into that meeting with her and when I went in there, I sat right at the head of the table. I said how ya'll doin'? If I had not gone into that meeting, they would not... they... they would have . . . we would have got the new licenses, but those new licenses would have been given to people already on the list . . .

34.     **GLENN** further stated, "So I had to defend [House Bill 2], and I mean if I had not been in that meeting, you tell [Businessperson 1 and Businessperson 2], they wouldn't even have a shot. You know."

*The Second Payment*

35.     On May 18, 2018, Associate 1 told **GLENN** that Businessperson 3 was "looking for a license".

36.     On June 7, 2018, Associate 1 stated to **GLENN** that "we might be able to make some money with [Businessperson 3] like we did with [Businessperson 1 and Businessperson 2]."

37.     On June 12, 2018, Associate 1, **GLENN** and Businessperson 3 met at a restaurant in Baltimore, Maryland and discussed medical marijuana licenses. Prior to Businessperson 3's arrival, **GLENN** and Associate 1 discussed that Associate 1 would act as the "go-between" for payments from Businessperson 3 to **GLENN**. Once Businessperson 3 arrived, **GLENN** told Businessperson 3 that she previously created a bill that awarded a company a medical marijuana growing license and that other applicants were "pissed off" and asked "who the hell do they

8

know? 'Cause they didn't have any high-priced lobbyists or anything." **GLENN** stated, "I said they know God and Cheryl **GLENN**."

38.     On June 18, 2018, **GLENN** called Associate 1 and **GLENN** asked if Businessperson 3 was "lookin' for [**GLENN**] to help him or something?" Associate 1 responded, "yes," and **GLENN** stated, "I'm not askin' people to give me money and I'm promising something I can't promise, but I mean is he going to be makin' a donation or something?" **GLENN** said, "I've stopped spending time with people if they're not um, donating to … you know what I mean." **GLENN** said, "I wanna tell you what other people have done um, and then nothin' is a guarantee, but I've had… I've had a lot of donations from other people who wanna get in the business, and they're kind of donating to me, you know um, I guess because they want me to be to the degree that I can an advocate for them." **GLENN** said, "you know I gotta deal with folk I don't know a certain way. You know." Associate 1 asked if **GLENN** and Associate 1 should "do what we did with those guys in [city where Company 1 is located] and just chop the money." **GLENN** responded "Yeah."

39.     On July 31, 2018, Associate 1 left a voicemail on **GLENN**'s phone and stated, "I can't talk about it over the phone. There's been a significant ah, thing with [Businessperson 3], um, something I'd rather talk to you about in person." Within approximately 15 minutes, **GLENN** called Associate 1 and Associate 1 told **GLENN**, "I can't talk to you about it over the phone . . . ah, things have really financially gotten better with [Businessperson 3], and ah, whenever you can meet me… sooner the better." **GLENN** agreed to meet with Associate 1 at a later date.

40.     On August 10, 2018, **GLENN** and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, Associate 1 told **GLENN** that Businessperson 3 had offered to

give him $10,000 cash if he could get the law changed in Maryland so that local businesses

would be given priority for medical marijuana licenses. Associate 1 said he could split the

$10,000 with **GLENN**. **GLENN** agreed to introduce legislation to get the law changed in

exchange for a payment of $5,000.

41.     On August 15, 2018, **GLENN** called Associate 1 and Associate 1 stated that

Businessperson 3 wanted some type of proof that the law would be changed to give Maryland

businesses a priority when competing for medical marijuana licenses. **GLENN** and Associate 1

had the following exchange:

> Associate 1:    If you can just shoot me an email or somethin' sayin'
> we're gonna... not we... but you're gonna introduce
> legislation where Maryland businesses get a priority
> in... in these licenses. I'll just show it to him then
> erase it. I mean there's no guarantee you know on
> anything. Ah, he's got this...
>
> **GLENN**:       Uh-huh.
>
> Associate 1:    ...and then I'll just show him the email and erase it.
> I'm actually gonna see him later today. Um...
>
> **GLENN**:       Um, so you're saying... You're saying that if... if I
> put this in an email, he'll cough up this money?
>
> Associate 1:    Yep.
>
> **GLENN**:       Well... what... what... Um, text me your email
> address. 'Cause I don't think I have your email
> address.
>
> Associate 1:    All right. I'll do that. All right.

42.     On August 15, 2018, **GLENN** sent an email to Associate 1, with the subject line

"MEDICAL MARIJUANA LICENSES", which stated:

> As it relates to the new licenses that will be available for minorities
> for medical marijuana in the State of Maryland, the issue of
> preferences for applicants who are residents of the State of Maryland

has been a controversial conversation. Many of the legislators believe that there should be a preference given to those applicants who are residents of the State of Maryland. In the upcoming 2019 Legislative Session, there will be a strong effort to amend the law, as well as the regulations, so that preferences will be given to applicants for medical marijuana licenses who reside in the State of Maryland. I will take the lead on the effort to get the law changed to provide the residency preference for the medical marijuana licenses.

43.     On August 16, 2018, **GLENN** called Associate 1 and Associate 1 told **GLENN**, "That email was perfect. I showed it to [Businessperson 3] and he's happy with that, and ah, he's gonna get me the cash." Later in the conversation, Associate 1 told **GLENN**, "Maybe I can give you the cash Wednesday" and **GLENN** responded, "That would be awesome. That would be awesome."

44.     On August 23, 2018, **GLENN** and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, Associate 1 handed **GLENN** $5,000 in United States currency. After handing **GLENN** the money, Associate 1 stated, "That's what that email did for us." Associate 1 cautioned **GLENN** about putting all of the money into the bank at one time to which **GLENN** responded, "No. No. I won't."

*The Third Payment*

45.     On October 9, 2018, Associate 1 called **GLENN** and **GLENN** stated "Tell [Businessperson 3] I need s... I, I need some help."

46.     On October 12, 2018, **GLENN** and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, **GLENN** gave Associate 1 documents which reflected changes proposed by the Commission to Maryland's medical marijuana regulations as a result of House Bill 2. **GLENN** told Associate 1, "I got this shit done" and "it took a lot of work." **GLENN** stated, "I fought my ass off for this." **GLENN** stated that a $20,000 "personal loan" from someone would "clear up everything" for her and later asked, "Do you know how much

11

somebody would charge [Businessperson 3] to give him all this shit?" Associate 1 responded, "Well you said twenty grand." **GLENN** stated, "I'm telling you, that would get me out of the hole." Associate 1 told **GLENN** that he would meet with Businessperson 3 and attempt to obtain the $20,000 that she solicited. **GLENN** responded, "Okay. Well... Well... If not, as much of it as you can."

47.     On October 16, 2018, Associate 1 called **GLENN** and said they could "get some cashola out of [Businessperson 3]" because Businessperson 3 operated a methadone clinic and wanted to turn the operation of the clinic over to Businessperson 3's daughter so he could focus full time on his prospective medical marijuana business. Associate 1 told **GLENN** that under current Maryland law, Businessperson 3's daughter needed three years of experience to be the director of a methadone clinic, and that Businessperson 3 wanted the law changed so that only two years of experience was required. **GLENN** asked Associate 1 to send her a copy of the law and **GLENN** said she would "work on it." The following exchange occurred:

| | |
|---|---|
| **GLENN:** | So is he able to help me? |
| Associate 1: | Ah... Ju... For a quick five [$5,000]. |
| **GLENN:** | That... That's fine. |
| Associate 1: | Yeah. |
| **GLENN:** | That's fine. Um... Um... So ah, when do you think... When do you think that would happen? |
| Associate 1: | We can make this happen in the next couple days. |
| **GLENN:** | Okay. All right. I'm going to Annapolis (unintelligible)... |
| Associate 1: | And he... But Cheryl, I gotta... I gotta let him know... I gotta prove to this guy that we're pre-filing this. I mean he ain't... |

**GLENN:**    Okay. You...

Associate 1:    Just ain't gonna throw money at me.

**GLENN:**    You can tell... No. No.

Associate 1:    Okay.

**GLENN:**    But you can tell him...

Associate 1:    Okay.

**GLENN:**    ... ah, if he gets me the copy of whatever it is then I can... I can get it pre-filed. That... That's... That's a easy thing.

48.    On October 18, 2018, **GLENN** pre-filed House Bill 35, titled "Public Health – Opioid Maintenance Therapy Programs – Medical Director Requirement and Qualifications." **GLENN** sent a text message to Associate 1, which stated "The bill has been pre-filed."

49.    On October 19, 2018, Associate 1 called **GLENN** and **GLENN** explained how it was easy to pre-file legislation, "[b]ecause all you do is call the bill drafter, and you tell him what part of the law, you know, and you had given me all of that, and, and they create, they create the bills. I mean they used to doing that [for **GLENN**]." **GLENN** further explained, "You can pre-file anything and then they schedule it for a bill hearing. That all is done during the session." When Associate 1 said he was surprised that **GLENN** did not have a delay in getting the bill pre-filed, **GLENN** responded, "Not when they know you. You know? So if I wasn't elected... I mean if they didn't already know me, they, they wouldn't have done it that quick." When Associate 1 asked **GLENN** if she had received confirmation of the pre-filing of the legislation, **GLENN** stated, "They send um, a reference number" which **GLENN** said would come to her legislative email account. **GLENN** said she would follow up on the confirmation email from her legislative assistant. **GLENN** and Associate 1 agreed to meet on Monday

13

[October 22, 2018] so Associate 1 could give **GLENN** the money in exchange for pre-filing the legislation.

50.     On October 20, 2018, Associate 1 received an email from **GLENN**.  The email stated "LR0623 – OPIOID MAINTENANCE THERAPY – MEDICAL DIRECTOR – REQUIRED EXPERIENCE," which referred to the Legislative Reference number that was assigned to **GLENN**'s request for the bill.

51.     On October 22, 2018, **GLENN** met Associate 1 at a restaurant in Baltimore, Maryland.  During the meeting, Associate 1 handed **GLENN** $5,000 in United States currency. As he was giving the money to **GLENN**, Associate 1 stated, "That's five grand cash."  Associate 1 stated, "So when you get that bill, if you can just flip it over.  That'll make [Businessperson 3] get more excited about the next (unintelligible)."  Associate 1 cautioned **GLENN** about depositing the cash at her bank, and told **GLENN** to only deposit "a little bit at a time." **GLENN** responded, "No.  No no.  I won't.  No.  No, I won't.  No, I won't.  No, I got stuff I need to take care of. "

52.     On January 9, 2019, **GLENN** introduced, as its sponsor, House Bill 35 titled "Public Health – Opioid Maintenance Therapy Programs – Medical Director Requirement and Qualifications."

### *The Fourth and Fifth Payments*

53.     On December 3, 2018, Associate 1 called **GLENN** and **GLENN** said that she had financial problems.  Associate 1 responded, "Well that's all right.  Listen, 'cause I got… I got a couple… You know, I've been out hustling too.  I… I'm tryin' to get some Christmas cash.  I got somethin' good…"  **GLENN** interrupted Associate 1 and asked, "Well what do you… What do you need… What do you need me to do?"  Associate 1 told **GLENN** that Businessperson 3

needed help obtaining a liquor license for a restaurant that he wanted to open in Baltimore City. Associate 1 stated that Delegate 1 introduced a bill during the previous legislative session which created a liquor license at a specific location. Associate 1 stated, "[Businessperson 3's] got five grand like ready now. He knows that a license would cost him at least on average of no less than sixty, seventy thousand dollars. So ah, it'd be five grand up front and another fifteen when the license is granted. This is a no-brainer and I can send you what it looks like." **GLENN** said, "So all he needs me to do is a bill to, to replicate what [Delegate 1] did for [a location in a specific district]" and **GLENN** further said, "It would have to be for the 45th District because I couldn't do it if it's not my District." **GLENN** stated, "I'd be happy to do it" and "Doing a bill like that is not a problem." The following exchange occurred:

| | |
|---|---|
| **GLENN:** | It wouldn't be a pre-filed bill 'cause it's past the deadline. |
| Associate 1: | It doesn't matter. I can have… |
| **GLENN:** | I can do it. I can… |
| Associate 1: | …the five grand by Monday. |
| **GLENN:** | Okay. All right. (Unintelligible). |
| Associate 1: | And then another fifteen… Then another fifteen once it's all introduced because he'll have twenty… |
| **GLENN:** | Okay. |
| Associate 1: | He'll have twenty grand tied up into a license which if he had to go buy one from you know, John Doe, he'd pay fifty to seventy-five grand so this is a cheap deal. |
| **GLENN:** | Okay. |
| Associate 1: | And then I'm gonna be the managing partner in the vent… in the venture. |

**GLENN:**    Okay.

Associate 1:    All right.

**GLENN:**    All right.  So, so just send me what [Delegate 1] did and then… and then just… you know, um, just um, I just need… It's… 'Cause if she did it for a specific area, then you have to tell me the exact area that you need it in.

**GLENN** told Associate 1 that she would direct "Bill Drafting [to] draft the bill."

54.    On December 6, 2018, **GLENN** sent a text message to Associate 1 which stated "I need the exact location.  See how [Delegate 1] included it in the bill.  No problem to get this filed tomorrow as long as you get me the location.  Thanks."  Associate 1 sent a text message to **GLENN** with an exact location for the liquor license.

55.    On December 10, 2018, **GLENN** and Associate 1 met at a restaurant in Baltimore, Maryland.  During the meeting, Associate 1 handed **GLENN** $5,000 in United States currency and confirmed with **GLENN** that she would receive the other fifteen grand once she "introduce[d] the bill."  **GLENN** said, "I just had my staff person do it this morning."  **GLENN** asked, "This is a complete five?  'Cause last time it was two-fifty short."  Associate 1 asked, "You wanna go to the car and count it?"  **GLENN** responded, "No."

56.    Later that day, **GLENN** and Associate 1 exchanged a series of text messages. **GLENN** stated, "It's short again . . . much more this time (sad face emoji).  Help please."  When Associate 1 asked how much the payment was short and if Glenn had checked the count, Glenn stated "4 times, 500.  Before it was 250."  When Associate 1 told Glenn he/she would have Businessperson 3 add the $750 to the $15,000 payment in January, Glenn responded "Not your fault.  I could really use it now."

57.     On December 11, 2018, **GLENN** sent an email to Associate 1, which forwarded an email that had been sent to **GLENN** on December 11, 2018 from the bill drafting office and was titled "Acknowledgement Letter LR0995 – Glenn, Cheryl D., Delegate." The forwarded email stated, in part, "Dear Delegate Glenn: This is to acknowledge receipt of your request that we prepare legislation for you in anticipation of the 2019 Session of the General Assembly." Referenced in the forwarded email was "Subject: BALTIMORE CITY – ALCOHOLIC BEVERAGES – CLASS B-D-7 LICENSES."

58.     On December 20, 2018, **GLENN** arranged to meet with Associate 1 in the parking lot of a shopping center in Baltimore, Maryland. During the meeting in **GLENN's** vehicle, the Associate 1 provided **GLENN** with an additional $750 as payment for the amount that **GLENN** falsely claimed she had been shorted in the prior payments.

59.     On January 10, 2019, **GLENN** sent Associate 1 a text message in which **GLENN** stated, "I have the Blue Back for the alcohol bill you requested in my district. Please give me the details on why this is needed ASAP." A "Blue Back" is a term used in the Maryland General Assembly to refer to the original copy of a bill.

60.     On January 14, 2019, Associate 1 called **GLENN** and **GLENN** asked Associate 1 to provide her with a description of Businessperson 3's restaurant so she would be able to explain the business to potential co-sponsors of the bill. Associate 1 agreed to provide the information to **GLENN**. **GLENN** told Associate 1, "I'm not gonna give this to anybody" and "I'm not sharing this with anybody." Associate 1 thereafter provided **GLENN** with the information she requested.

61.     On January 28, 2019, Associate 1 called **GLENN** and **GLENN** told Associate 1 that she had "dropped" the Blue Back on Friday, January 25, 2019, and that the bill would

probably become available later in the week. **GLENN** stated that she had signed off on the bill as did another delegate, and she intended to get a senator to cross-file the bill. **GLENN** stated that she had "two bills ah, for [Associate 1]." **GLENN** stated, "The opioid bill is out" and "It's got a number and everything." Toward the latter part of the conversation, Associate 1 told **GLENN** "Well then when that liquor thing goes in, if you can give me at least a week for me to tell him [Businessperson 3] to get his money [the $15,000 cash] ready. **GLENN** responded "Okay. Okay."

62.     On January 28, 2019, **GLENN**, introduced, as its sponsor, House Bill 347, titled, "Baltimore City – Alcoholic Beverages – Class B-D-7 Licenses."

63.     On January 31, 2019, **GLENN** called Associate 1 and told Associate 1 that the liquor bill was House Bill 347. **GLENN** explained that the Economic Matters Committee would schedule a hearing for the bill and that **GLENN** would present the bill to the delegation, but she would need someone to represent Businessperson 3. In a subsequent call, Associate 1 told **GLENN** that Associate 1 would provide her with $15,000 on February 11, 2019, for introducing House Bill 347.

64.     On February 11, 2019, **GLENN** arranged to meet with Associate 1 at a hotel in Annapolis, Maryland so that Associate 1 could pay **GLENN** $15,000 in cash for introducing House Bill 347. When she arrived at the hotel, **GLENN** called Associate 1 and asked Associate 1 to come to her car. Associate 1 entered **GLENN's** car and **GLENN** proceeded to drive from the hotel at a high rate of speed to another nearby parking lot. When **GLENN** parked the vehicle, **GLENN** said she needed Associate 1 to sign a document as "an insurance thing." The document, drafted by **GLENN**, falsely stated, "To whom it may concern: The money, $15,000.00, received from my friend, [Associate 1], this morning, is in NO way connected to my

position as a State Delegate . . . I have not made any promises to use my position as a State Delegate for any purposes. The money is a gift and is not being given to me in exchange for any political favors." **GLENN** told Associate 1 that "this protects you and I." **GLENN** proceeded to count stacks of cash and confirmed she received the full $15,000.00.

### The Charge

65.     On or about December 11, 2018, in the District of Maryland and elsewhere, the defendant,

### CHERYL DIANE GLENN,

for the purpose of executing and attempting to execute the scheme to defraud, transmitted and caused to be transmitted by means of wire communication in interstate commerce writings, signs, signals, pictures, and sounds, that is, an email forwarded from **GLENN** to Associate 1 with no subject line, which stated, "Dear Delegate Glenn: This is to acknowledge receipt of your request that we prepare legislation for you in anticipation of the 2019 Session of the General Assembly . . . LR Number: 9LR0995 Staff Member: [Staff Member 1] Subject: BALTIMORE CITY – ALCOHOLIC BEVERAGES – CLASS B-D-7 LICENSES."

18 U.S.C. §§ 1343 and 1346

## COUNT TWO
### (Travel Act)

The United States Attorney for the District of Maryland further charges that at all times relevant to this Information:

1.      Paragraphs 1 through 64 of Count One of this Information are re-alleged and incorporated herein by reference.

2.      On or about October 18, 2018, in the District of Maryland and elsewhere, the defendant,

### CHERYL DIANE GLENN,

did use and cause to be used a facility in interstate commerce, that is, **GLENN** used a cellular telephone to send a text message to Associate 1 in which **GLENN** stated, "The bill has been pre-filed," with the intent to promote, manage, establish, carry on, and facilitate the promotion, management, establishment and carrying on of an unlawful activity, to wit: bribery in violation of Maryland Criminal Law § 9-201(c) ("Public employee demanding or receiving bribe"); and thereafter did perform and attempt to perform acts to promote, manage, establish and carry on, and to facilitate the promotion, management, establishment and carrying on of said unlawful activity.

18 U.S.C. § 1952(a)(3) and (b)(2)

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further finds that:

1.     Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), in the event of the defendant's convictions under Counts One and Two of this Information.

2.     As a result of the offenses alleged in Counts One and Two of this Information, the defendant,

### CHERYL DIANE GLENN,

shall forfeit to the United States any property, real and personal, which constitutes and is derived from proceeds traceable to the violations. The property to be forfeited includes, but is not limited to, the following: $33,750 in U.S. Currency.

### Substitute Assets

3.     If, as a result of any act or omission of the defendant, any proceeds subject to forfeiture:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p) to seek forfeiture of any other property of said defendant.

18 U.S.C. § 981(a)(1)(C)

21

21 U.S.C § 853
28 U.S.C. § 2461(c)

*Robert K. Hur*/DEH

Robert K. Hur
United States Attorney

July 23, 2019
Date