



FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2020 JAN 22 PM 4: 59

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Derek Hines
Assistant United States Attorney
derek.hines@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4817
MAIN: 410-209-4800

June 24, 2019

CCB 19-0351

William C. Brennan, Jr.
Brennan McKenna Manzi Shay, Chartered
6305 Ivy Ln Ste 700
Greenbelt, MD 20770
Email: wbrennan@brennanmckenna.com

Re:     United States v. Cheryl Diane Glenn

Dear Counsel:

This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Cheryl Diane Glenn (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by July 12, 2019, it will be deemed withdrawn. The terms of the Agreement are as follows:

<u>Offenses of Conviction</u>

1.     The Defendant agrees to waive indictment and plead guilty to Counts 1 and 2 of an Information, which charges the Defendant with Honest Services Wire Fraud, in violation of 18 U.S.C. §§ 1343 and 1346, and Use of an Interstate Facility to Carry On Unlawful Activity ("Travel Act"), in violation of 18 U.S.C. § 1952. The Defendant admits that the Defendant is, in fact, guilty of these offenses and will so advise the Court.

<u>Elements of the Offenses</u>

2.     The elements of the offenses to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

a.     **Count One – Honest Services Wire Fraud.** That on or about the dates charged in the Information, in the District of Maryland and elsewhere:

1. First, that there was a scheme or artifice to defraud or to obtain the intangible right of honest services by materially false and fraudulent pretenses, representations or promises, as alleged in the Information;

1

2. Second, that the Defendant knowingly and willfully participated in the scheme or artifice to defraud, with knowledge of its fraudulent nature and with specific intent to defraud; and

3. Third, that in execution of that scheme, the Defendant used or caused the use of the interstate wires for the purpose of executing the scheme as specified in the Information.

b. **Count Two – Travel Act.** That on or about the dates charged in the Information, in the District of Maryland and elsewhere:

1. The Defendant used and caused the use of an interstate facility;

2. The use of the interstate facility was done with the intent to promote, manage, establish, or carry on or distribute the proceeds of an unlawful activity, to wit, state bribery in violation of Section 9-201(c) ("Public employee demanding or receiving bribe"), Md. Crim. Law (formerly Art. 27, Section 22); and

3. After the use of the interstate facility, the Defendant performed or attempted to perform an act in furtherance of this same unlawful activity.

## Penalties

3.      The maximum penalties provided by statute for the offenses to which the Defendant is pleading guilty are as follows:

| COUNT | STATUTE | MAND. MIN. IMPRISON-MENT | MAX IMPRISON-MENT | SUPERVISED RELEASE | MAX FINE | SPECIAL ASSESS-MENT |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. §§ 1343, 1346 | None | 20 years | Not more than 5 years | $250,000 | $100 |
| 2 | 18 U.S.C. § 1952 | None | 5 years | Not more than 3 years | $250,000 | $100 |

a.      Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

b.      Supervised Release:  If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment up to the entire original term of supervised release if permitted by statute, followed by an additional term of supervised release.

2

c.      Restitution:  The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

d.      Payment:  If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d).  The Defendant may be required to pay interest if the fine is not paid when due.

e.      Forfeiture:  The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

f.      Collection of Debts:  If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt.  If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law.  Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control.  Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns.  The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

4.      The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a.      If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel.  That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b.      If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community.  Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily.  All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count.  The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.      If the Defendant went to trial, the government would have the burden of proving

3

the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

        d.     The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

        e.     If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

        f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

        g.     If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

        h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

        i.     The Defendant has the right to have the Defendant's case presented to a Grand Jury, which would decide whether there is probable cause to return an Indictment against the Defendant. By agreeing to proceed by way of Information, the Defendant is giving up that right,

and the Defendant understands that the charges will be filed by the United States Attorney without a Grand Jury.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6.      This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable guideline calculation is as follows:

|   |   |   |
|---|---|---|
| a. | Base offense level (U.S.S.G. § 2C1.1(a)(1)) | 14 |
| b. | More than one bribe (U.S.S.G. § 2C1.1(b)(1)) | +2 |
| c. | Value of the bribe (U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b)(1)(C)) | +4 |
| d. | Elected public official (U.S.S.G. § 2C1.1(b)(3)) | +4 |
| e. | Attempting to obstruct justice (U.S.S.G. § 3C1.1) | +2 |
| | TOTAL | 26 |

This Office does not oppose a two-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a), based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's acceptance of personal responsibility for the Defendant's conduct. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

7.      There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. The parties anticipate that the Defendant's criminal history is a category I.

5

8.     Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

9.     At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a).  This Office reserves the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office deems relevant to sentencing, including the conduct that is the subject of any counts of the Information.  At the time of sentencing, this Office will move to dismiss any open counts against the Defendant.

## Waiver of Appeal

10.     In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

     a.     The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever.  This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statute(s) to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statute(s) to the extent such challenges legally can be waived.

     b.     The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

          (i)     The Defendant reserves the right to appeal any sentence that exceeds the statutory maximum; and

          (ii)     This Office reserves the right to appeal any sentence below a statutory minimum; and

     c.     The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

6

### Forfeiture

11.   The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses), substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.   Specifically, but without limitation on the government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities:  the $33,750 that the Defendant solicited or accepted in bribe payments.

The Defendant agrees to consent to the entry of orders of forfeiture for the property described in the above subparagraph and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment.

The Defendant agrees to assist fully in the forfeiture of the above property.  The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint.  The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

### Defendant's Conduct Prior to Sentencing and Breach

12.   Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make

sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement.

## Court Not a Party

13. The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

14. This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

*[Remainder of page intentionally blank]*

8

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Robert K. Hur
United States Attorney

By: _____

Derek E. Hines
Leo J. Wise
Assistant United States Attorneys

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

7/16/19
Date

Cheryl Diane Glenn
Defendant

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

07/16/2019
Date

William C. Brennan, Esq.
Counsel for Defendant

## ATTACHMENT A

## STIPULATION OF FACTS

*The Defendant, Cheryl Diane Glenn, stipulates and agrees that if this case had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt. The defendant stipulates and agrees that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

At all relevant times, the Defendant, Cheryl Diane Glenn ("GLENN"), was a Delegate in the Maryland House of Delegates, representing District 45, which covered portions of Baltimore, Maryland. GLENN was the Chair of the Banking, Consumer Protection, and Commercial Law Subcommittee of the Economic Matters Committee; the Vice Chair of the Rules and Executive Nominations Committee; the Chair of the Baltimore City Delegation; and a member of the Women Legislators of Maryland Caucus and the Legislative Black Caucus of Maryland, among other memberships.

The State of Maryland and its citizens had an intangible right to the honest services of its elected officials. As a Delegate of the General Assembly, GLENN owed the State of Maryland and its citizens a fiduciary duty to, among other things, refrain from soliciting and receiving bribes in exchange for taking, or agreeing to take, official actions.

### Maryland Medical Marijuana Legislation

Since 2013, the General Assembly of Maryland has enacted legislation that resulted in the award of licenses permitting companies to grow, process, and dispense medical marijuana. GLENN was actively involved in sponsoring such legislation and in securing its passage. For example, GLENN was a sponsor of House Bill 1101, passed by the state legislature and signed into law by the Governor in 2013, which authorized access to medical marijuana in the State of Maryland for qualifying individuals and established the Natalie M. LaPrade Medical Cannabis Commission ("Commission"). GLENN was a sponsor of House Bill 881, passed by the state legislature and signed into law by the Governor in 2014, which set a limit of fifteen licensed marijuana growers in Maryland. GLENN was a sponsor of House Bill 490, passed by the state legislature and signed into law by the Governor in 2015, which established requirements for the Commission to license medical marijuana processors in the State of Maryland.

In 2016, the Commission began the process of awarding fifteen medical marijuana grower licenses and fifteen medical marijuana processor licenses in the State of Maryland.

House Bill 2, the "Natalie M. LaPrade Medical Cannabis Commission Reform Act," increased the number of medical marijuana grower licenses from fifteen to twenty-two and established a new cap of twenty-eight processing licenses. House Bill 2 was pre-filed by GLENN on September 25, 2017, and introduced on January 10, 2018. House Bill 2 initially passed the House by a vote of 121-16, with GLENN voting in favor, on March 8, 2018. After amendments from the Senate, House Bill 2 passed the House by a vote of 118-15 on April 7, 2018, with GLENN

10

voting in favor. It was passed by the Senate on April 9, 2018, and approved by the Governor on May 15, 2018.

## Maryland Opioid Maintenance Therapy Regulations

Maryland law governs opioid maintenance therapy programs involving the use of pharmacological interventions to provide treatment, support, and recovery to opioid-addicted patients. Pursuant to this law and regulations promulgated by the Maryland Department of Health, any such program was required to have a medical director who was a physician with at least 3 years of documented experience providing services to individuals who are addicted to alcohol or other drugs.

House Bill 35, titled "Public Health – Opioid Maintenance Therapy Programs – Medical Director Requirement and Qualifications," amended this requirement so that a medical director of an opioid maintenance therapy program needed to be a physician with only 2 years of documented experience providing services to individuals who are addicted to alcohol or other drugs. House Bill 35 was pre-filed by GLENN on October 18, 2018, and introduced on January 9, 2019.

## Maryland Alcohol and Liquor License Legislation

Under Maryland law, alcohol licenses are divided into different classes. Class A licenses authorize their holders to sell, for consumption off the premises, beer, wine, and liquor six days per week. Class B licenses authorize their holders to sell beer and wine seven days per week and liquor every day except Sunday; certain Class B licenses were for consumption on the premises, while other Class B licenses had an off-sale privilege.

House Bill 347, titled "Baltimore City – Alcoholic Beverages – Class B-D-7 Licenses," established an additional class B license within District 45, which was GLENN's District. GLENN requested that the Maryland Department of Legislative Services draft House Bill 347 on or about December 10, 2018, and it was co-sponsored by GLENN and introduced on January 28, 2019.

## The First Payment

On or about March 4, 2018, during a phone call between GLENN and Associate 1, Associate 1 discussed Company 1's interest in obtaining a medical marijuana grow, processing and dispensary license in Maryland. During this phone call, GLENN told Associate 1 that she had an outstanding tax debt and GLENN and Associate 1 agreed that GLENN and Associate 1 would solicit money from Company 1 to pay the tax debt in exchange for agreeing to perform an official act. GLENN agreed to meet with representatives of Company 1, including Businessperson 1 and Businessperson 2, and she said she would bring her tax bill of almost $3,000 to the meeting.

On or about March 5, 2018, GLENN met with Associate 1, Businessperson 1, and Businessperson 2 at a restaurant in Annapolis, Maryland. During the meeting, Businessperson 1 expressed to GLENN that it was Company 1's desire to obtain a new license pursuant to House Bill 2 that had been recently introduced, but not yet enacted. GLENN took a white, letter-sized

11

envelope out of her purse and passed it to Associate 1. The envelope contained an outstanding property tax bill for GLENN's residence in the amount of $2,716. GLENN and Associate 1 agreed that GLENN would use her position as a state legislator to vote for HB-2, which could favor Company 1 in its pursuit of a medical marijuana license. GLENN agreed to do so in exchange for a $3,000 cash payment from Associate 1 to GLENN, which Associate 1 would attempt to obtain from Company 1.

On or about March 6, 2018, Associate 1 and GLENN exchanged a series of text messages. Associate 1 asked GLENN, "How did your bill go today?" and GLENN responded, "Better than expected, passed 2nd reader with NO amendments offered and no debate. WOW!! 3rd reader tomorrow, then to the Senate." GLENN later said, "I really hope you can get this done for me." Associate 1 said, "I need your deposit slip and a check so there is no question who paid it. That way everything is kosher." GLENN asked Associate 1 to "pay it with cash". Associate 1 responded, "I can do it with [Associate 2] or by myself but best with [Associate 2] so there isn't a connection. [Businessperson 1] flies to r.i. tomorrow back to [name of city] sat. Wires me $ Sunday then I'll contact [Associate 2]... do not fret, invoice is in my safe at home...only u me and [Associate 2] will know so stop worrying."

On March 7, 2018, in response to a message GLENN had received from Associate 1 asking about the status of the bill, GLENN sent a text stating, "3rd reader tomorrow."

On March 8, 2018, GLENN voted in favor of House Bill 2 on its Third Reading.

On April 7, 2018, GLENN voted in favor of House Bill 2 after amendments from the Senate.

On April 19, 2018, GLENN and Associate 1 spoke over the phone. During the call, Associate 1 explained to GLENN that Company 1 was ready to make the $3,000 payment to GLENN because "[t]hey wanted to wait until everything went through the General Assembly." GLENN arranged to receive the $3,000 the following day.

On April 20, 2018, GLENN and Associate 1 met at a restaurant in Baltimore County. During the meeting, Associate 1 handed GLENN $3,000 in United States currency. GLENN said, "[w]e passed the bill" and "I had to fight like hell. You have no idea how I had to fight." Associate 1 said, "[Businessperson 1 and Businessperson 2] appreciate you. What you did to get the pot. I mean, and they hope to get a license in Maryland." GLENN responded, "Well let me tell you something - You let them know, and I'm serious . . . let them know there was a meeting with [Senator 1] right before *sine die*, on the medical marijuana bill ... and I wasn't invited to it and when I called [Senator 1's] office they said well Delegate GLENN, it's only for [Senator 1] and a few other Senators. So what I did, I went over to [Senator 2's] office and hung around 'cause I knew she was gonna be goin'. She took me into that meeting with her and when I went in there, I sat right at the head of the table. I said how ya'll doin'? If I had not gone into that meeting, they would not... they... they would have . . . we would have got the new licenses, but those new licenses would have been given to people already on the list . . ." GLENN further stated, "So I

had to defend [House Bill 2], and I mean if I had not been in that meeting, you tell [Businessperson 1 and Businessperson 2], they wouldn't even have a shot. You know."

*The Second Payment*

On May 18, 2018, Associate 1 told GLENN that Businessperson 3 was "looking for a license."

On June 7, 2018, Associate 1 stated to GLENN that "we might be able to make some money with [Businessperson 3] like we did with [Businessperson 1 and Businessperson 2]."

On June 12, 2018, Associate 1, GLENN and Businessperson 3 met at a restaurant in Baltimore, Maryland, and discussed medical marijuana licenses. Prior to Businessperson 3's arrival, GLENN and Associate 1 discussed that Associate 1 would act as the "go-between" for payments from Businessperson 3 to GLENN. Once Businessperson 3 arrived, GLENN told Businessperson 3 that she previously created a bill that awarded a company a medical marijuana growing license and that other applicants were "pissed off" and asked "who the hell do they know? 'Cause they didn't have any high-priced lobbyists or anything." GLENN stated, "I said they know God and Cheryl GLENN."

On June 18, 2018, GLENN called Associate 1 and GLENN asked if Businessperson 3 was "lookin' for [GLENN] to help him or something?" Associate 1 responded, "yes," and GLENN stated, "I'm not askin' people to give me money and I'm promising something I can't promise, but I mean is he going to be makin' a donation or something?" GLENN said, "I've stopped spending time with people if they're not um, donating to ... you know what I mean." GLENN said, "I wanna tell you what other people have done um, and then nothin' is a guarantee, but I've had... I've had a lot of donations from other people who wanna get in the business, and they're kind of donating to me, you know um, I guess because they want me to be to the degree that I can an advocate for them." GLENN said, "you know I gotta deal with folk I don't know a certain way. You know." Associate 1 asked if GLENN and Associate 1 should "do what we did with those guys in [city where Company 1 is located] and just chop the money." GLENN responded "Yeah."

On July 31, 2018, Associate 1 left a voicemail on GLENN's phone and stated, "I can't talk about it over the phone. There's been a significant ah, thing with [Businessperson 3], um, something I'd rather talk to you about in person." Within approximately 15 minutes, GLENN called Associate 1 and Associate 1 told GLENN, "I can't talk to you about it over the phone . . . ah, things have really financially gotten better with [Businessperson 3], and ah, whenever you can meet me... sooner the better." GLENN agreed to meet with Associate 1 at a later date.

On August 10, 2018, GLENN and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, Associate 1 told GLENN that Businessperson 3 had offered to give him $10,000 cash if he could get the law changed in Maryland so that local businesses would be given priority for medical marijuana licenses. Associate 1 said he could split the $10,000 with GLENN. GLENN agreed to introduce legislation to get the law changed in exchange for a payment of $5,000.

13

On August 15, 2018, GLENN called Associate 1 and Associate 1 stated that Businessperson 3 wanted some type of proof that the law would be changed to give Maryland businesses a priority when competing for medical marijuana licenses. GLENN and Associate 1 had the following exchange:

> Associate 1:   If you can just shoot me an email or somethin' sayin' we're gonna... not we... but you're gonna introduce legislation where Maryland businesses get a priority in... in these licenses. I'll just show it to him then erase it. I mean there's no guarantee you know on anything. Ah, he's got this...
>
> GLENN:   Uh-huh.
>
> Associate 1:   ...and then I'll just show him the email and erase it. I'm actually gonna see him later today. Um...
>
> GLENN:   Um, so you're saying... You're saying that if... if I put this in an email, he'll cough up this money?
>
> Associate 1:   Yep.
>
> GLENN:   Well... what... what... Um, text me your email address. 'Cause I don't think I have your email address.
>
> Associate 1:   All right. I'll do that. All right.

On August 15, 2018, GLENN sent an email to Associate 1, with the subject line "MEDICAL MARIJUANA LICENSES", which stated:

> As it relates to the new licenses that will be available for minorities for medical marijuana in the State of Maryland, the issue of preferences for applicants who are residents of the State of Maryland has been a controversial conversation. Many of the legislators believe that there should be a preference given to those applicants who are residents of the State of Maryland. In the upcoming 2019 Legislative Session, there will be a strong effort to amend the law, as well as the regulations, so that preferences will be given to applicants for medical marijuana licenses who reside in the State of Maryland. I will take the lead on the effort to get the law changed to provide the residency preference for the medical marijuana licenses.

On August 16, 2018, GLENN called Associate 1 and Associate 1 told GLENN, "That email was perfect. I showed it to [Businessperson 3] and he's happy with that, and ah, he's gonna get me the cash." Later in the conversation, Associate 1 told GLENN, "Maybe I can give you the cash Wednesday" and GLENN responded, "That would be awesome. That would be awesome."

14

On August 23, 2018, GLENN and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, Associate 1 handed GLENN $5,000 in United States currency. After handing GLENN the money, Associate 1 stated, "That's what that email did for us." Associate 1 cautioned GLENN about putting all of the money into the bank at one time to which GLENN responded, "No. No. I won't."

*The Third Payment*

On October 9, 2018, Associate 1 called GLENN and GLENN stated "Tell [Businessperson 3] I need s... I, I need some help."

On October 12, 2018, GLENN and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, GLENN gave Associate 1 documents which reflected changes proposed by the Commission to Maryland's medical marijuana regulations as a result of House Bill 2. GLENN told Associate 1, "I got this shit done" and "it took a lot of work." GLENN stated, "I fought my ass off for this." GLENN stated that a $20,000 "personal loan" from someone would "clear up everything" for her and later asked, "Do you know how much somebody would charge [Businessperson 3] to give him all this shit?" Associate 1 responded, "Well you said twenty grand." GLENN stated, "I'm telling you, that would get me out of the hole." Associate 1 told GLENN that he would meet with Businessperson 3 and attempt to obtain the $20,000 that she solicited. GLENN responded, "Okay. Well... Well... If not, as much of it as you can."

On October 16, 2018, Associate 1 called GLENN and said they could "get some cashola out of [Businessperson 3]" because Businessperson 3 operated a methadone clinic and wanted to turn the operation of the clinic over to Businessperson 3's daughter so he could focus full time on his prospective medical marijuana business.   Associate 1 told GLENN that under current Maryland law, Businessperson 3's daughter needed three years of experience to be the director of a methadone clinic, and that Businessperson 3 wanted the law changed so that only two years of experience was required. GLENN asked Associate 1 to send her a copy of the law and GLENN said she would "work on it." The following exchange occurred:

| | |
|---|---|
| GLENN: | So is he able to help me? |
| Associate 1: | Ah... Ju... For a quick five [$5,000]. |
| GLENN: | That... That's fine. |
| Associate 1: | Yeah. |
| GLENN: | That's fine. Um... Um... So ah, when do you think... When do you think that would happen? |
| Associate 1: | We can make this happen in the next couple days. |
| GLENN: | Okay. All right. I'm going to Annapolis (unintelligible)... |

| Associate 1: | And he... But Cheryl, I gotta... I gotta let him know... I gotta prove to this guy that we're pre-filing this. I mean he ain't... |
| GLENN: | Okay. You... |
| Associate 1: | Just ain't gonna throw money at me. |
| GLENN: | You can tell... No. No. |
| Associate 1: | Okay. |
| GLENN: | But you can tell him... |
| Associate 1: | Okay. |
| GLENN: | ... ah, if he gets me the copy of whatever it is then I can... I can get it pre-filed. That... That's... That's a easy thing. |

On October 18, 2018, GLENN pre-filed House Bill 35, titled "Public Health – Opioid Maintenance Therapy Programs – Medical Director Requirement and Qualifications." GLENN sent a text message to Associate 1, which stated "The bill has been pre-filed." GLENN used an interstate facility in connection with sending this text message.

On October 19, 2018, Associate 1 called GLENN and GLENN explained how it was easy to pre-file legislation, "[b]ecause all you do is call the bill drafter, and you tell him what part of the law, you know, and you had given me all of that, and, and they create, they create the bills. I mean they used to doing that [for GLENN]." GLENN further explained, "You can pre-file anything and then they schedule it for a bill hearing. That all is done during the session." When Associate 1 said he was surprised that GLENN did not have a delay in getting the bill pre-filed, GLENN responded, "Not when they know you. You know? So if I wasn't elected... I mean if they didn't already know me, they, they wouldn't have done it that quick." When Associate 1 asked GLENN if she had received confirmation of the pre-filing of the legislation, GLENN stated, "They send um, a reference number" which GLENN said would come to her legislative email account. GLENN said she would follow up on the confirmation email from her legislative assistant. GLENN and Associate 1 agreed to meet on Monday [October 22, 2018] so Associate 1 could give GLENN the money in exchange for pre-filing the legislation.

On October 20, 2018, Associate 1 received an email from GLENN. The email stated "LR0623 – OPIOID MAINTENANCE THERAPY – MEDICAL DIRECTOR – REQUIRED EXPERIENCE," which referred to the Legislative Reference number that was assigned to GLENN's request for the bill.

On October 22, 2018, GLENN met Associate 1 at a restaurant in Baltimore, Maryland. During the meeting, Associate 1 handed GLENN $5,000 in United States currency. As he was giving the money to GLENN, Associate 1 stated, "That's five grand cash." Associate 1 stated, "So when you get that bill, if you can just flip it over. That'll make [Businessperson 3] get more excited about the next (unintelligible)." Associate 1 cautioned GLENN about depositing the cash

at her bank, and told GLENN to only deposit "a little bit at a time." GLENN responded, "No. No no. I won't. No. No, I won't. No, I won't. No, I got stuff I need to take care of. "

On January 9, 2019, GLENN introduced, as its sponsor, House Bill 35 titled "Public Health – Opioid Maintenance Therapy Programs – Medical Director Requirement and Qualifications."

### *The Fourth and Fifth Payments*

On December 3, 2018, Associate 1 called GLENN and GLENN said that she had financial problems. Associate 1 responded, "Well that's all right. Listen, 'cause I got... I got a couple... You know, I've been out hustling too. I... I'm tryin' to get some Christmas cash. I got somethin' good..." GLENN interrupted Associate 1 and asked, "Well what do you... What do you need... What do you need me to do?" Associate 1 told GLENN that Businessperson 3 needed help obtaining a liquor license for a restaurant that he wanted to open in Baltimore City. Associate 1 stated that Delegate 1 introduced a bill during the previous legislative session which created a liquor license at a specific location. Associate 1 stated, "[Businessperson 3's] got five grand like ready now. He knows that a license would cost him at least on average of no less than sixty, seventy thousand dollars. So ah, it'd be five grand up front and another fifteen when the license is granted. This is a no-brainer and I can send you what it looks like." GLENN said, "So all he needs me to do is a bill to, to replicate what [Delegate 1] did for [a location in a specific district]" and GLENN further said, "It would have to be for the 45th District because I couldn't do it if it's not my District." GLENN stated, "I'd be happy to do it" and "Doing a bill like that is not a problem." The following exchange occurred:

> GLENN:         It wouldn't be a pre-filed bill 'cause it's past the deadline.
>
> Associate 1:   It doesn't matter. I can have...
>
> GLENN:         I can do it. I can...
>
> Associate 1:   ...the five grand by Monday.
>
> GLENN:         Okay. All right. (Unintelligible).
>
> Associate 1:   And then another fifteen... Then another fifteen once it's all introduced because he'll have twenty...
>
> GLENN:         Okay.
>
> Associate 1:   He'll have twenty grand tied up into a license which if he had to go buy one from you know, John Doe, he'd pay fifty to seventy-five grand so this is a cheap deal.
>
> GLENN:         Okay.
>
> Associate 1:   And then I'm gonna be the managing partner in the vent... in the venture.
>
> GLENN:         Okay.

> Associate 1:   All right.
>
> GLENN:   All right. So, so just send me what [Delegate 1] did and then... and then just... you know, um, just um, I just need... It's... 'Cause if she did it for a specific area, then you have to tell me the exact area that you need it in.

GLENN told Associate 1 that she would direct "Bill Drafting [to] draft the bill."

On December 6, 2018, GLENN sent a text message to Associate 1 which stated "I need the exact location. See how [Delegate 1] included it in the bill. No problem to get this filed tomorrow as long as you get me the location. Thanks." Associate 1 sent a text message to GLENN with an exact location for the liquor license.

On December 10, 2018, GLENN and Associate 1 met at a restaurant in Baltimore, Maryland. During the meeting, Associate 1 handed GLENN $5,000 in United States currency and confirmed with GLENN that she would receive the other fifteen grand once she "introduce[d] the bill." GLENN said, "I just had my staff person do it this morning." GLENN asked, "This is a complete five? 'Cause last time it was two-fifty short." Associate 1 asked, "You wanna go to the car and count it?" GLENN responded, "No."

Later that day, GLENN and Associate 1 exchanged a series of text messages. GLENN stated, "It's short again . . . much more this time (sad face emoji). Help please." When Associate 1 asked how much the payment was short and if Glenn had checked the count, Glenn stated "4 times, 500. Before it was 250." When Associate 1 told Glenn he/she would have Businessperson 3 add the $750 to the $15,000 payment in January, Glenn responded "Not your fault. I could really use it now."

On December 11, 2018, GLENN sent an email to Associate 1, which forwarded an email that had been sent to GLENN on December 11, 2018 from the bill drafting office and was titled "Acknowledgement Letter LR0995 -- Glenn, Cheryl D., Delegate." The forwarded email stated, in part, "Dear Delegate Glenn: This is to acknowledge receipt of your request that we prepare legislation for you in anticipation of the 2019 Session of the General Assembly." Referenced in the forwarded email was "Subject:  BALTIMORE CITY – ALCOHOLIC BEVERAGES – CLASS B-D-7 LICENSES." GLENN admits that this email was a wire transmission and traveled in interstate commerce.

On December 20, 2018, GLENN arranged to meet with Associate 1 in the parking lot of a shopping center in Baltimore, Maryland. During the meeting in GLENN's vehicle, the Associate 1 provided GLENN with an additional $750 as payment for the amount that GLENN claimed she had been shorted in the prior payments.

On January 10, 2019, GLENN sent Associate 1 a text message in which GLENN stated, "I have the Blue Back for the alcohol bill you requested in my district. Please give me the details on why this is needed ASAP." A "Blue Back" is a term used in the Maryland General Assembly to refer to the original copy of a bill.

18

On January 14, 2019, Associate 1 called GLENN and GLENN asked Associate 1 to provide her with a description of Businessperson 3's restaurant so she would be able to explain the business to potential co-sponsors of the bill. Associate 1 agreed to provide the information to GLENN. GLENN told Associate 1, "I'm not gonna give this to anybody" and "I'm not sharing this with anybody." Associate 1 thereafter provided GLENN with the information she requested.

On January 28, 2019, Associate 1 called GLENN and GLENN told Associate 1 that she had "dropped" the Blue Back on Friday, January 25, 2019, and that the bill would probably become available later in the week. GLENN stated that she had signed off on the bill as did another delegate, and she intended to get a senator to cross-file the bill. GLENN stated that she had "two bills ah, for [Associate 1]." GLENN stated, "The opioid bill is out" and "It's got a number and everything." Toward the latter part of the conversation, Associate 1 told GLENN "Well then when that liquor thing goes in, if you can give me at least a week for me to tell him [Businessperson 3] to get his money [the $15,000 cash] ready. GLENN responded "Okay. Okay."

On January 28, 2019, GLENN, introduced, as its sponsor, House Bill 347 titled, "Baltimore City – Alcoholic Beverages – Class B-D-7 Licenses."

On January 31, 2019, GLENN called Associate 1 and told Associate 1 that the liquor bill was House Bill 347. GLENN explained that the Economic Matters Committee would schedule a hearing for the bill and that GLENN would present the bill to the delegation, but she would need someone to represent Businessperson 3. In a subsequent call, Associate 1 told GLENN that Associate 1 would provide her with $15,000 on February 11, 2019, for introducing House Bill 347.

On February 11, 2019, GLENN arranged to meet with Associate 1 at a hotel in Annapolis, Maryland so that Associate 1 could pay GLENN $15,000 in cash for introducing House Bill 347. When she arrived at the hotel, GLENN called Associate 1 and asked Associate 1 to come to her car. Associate 1 entered GLENN's car and GLENN proceeded to drive from the hotel at a high rate of speed to another nearby parking lot. When GLENN parked the vehicle, GLENN said she needed Associate 1 to sign a document as "an insurance thing." The document, drafted by GLENN, falsely stated, "To whom it may concern:  The money, $15,000.00, received from my friend, [Associate 1], this morning, is in NO way connected to my position as a State Delegate . . . I have not made any promises to use my position as a State Delegate for any purposes. The money is a gift and is not being given to me in exchange for any political favors." GLENN told Associate 1 that "this protects you and I." GLENN proceeded to count stacks of cash and confirmed she received the full $15,000.00.

In February 2019, GLENN was interviewed by FBI Special Agents. GLENN was asked about each of the payments she received on April 4, 2018 ($3,000), August 23, 2018 ($5,000), October 22, 2018 ($5,000), December 10, 2018 ($5,000), December 20, 2018 ($750), and February 11, 2019 ($15,000), and GLENN admitted that each of these payments were bribes. GLENN admitted that she knew that taking the payments was wrong and that the solicited/accepted payments were made in exchange for official acts that GLENN provided using her position as a Delegate.

19

GLENN admits that she knowingly and willfully participated in the scheme and artifice to defraud as alleged in Count One of the Information.  GLENN admits that she had the specific intent to promote, manage, establish, or carry on or distribute the proceeds of an unlawful activity, to wit, state bribery in violation of Section 9-201(c) ("Public employee demanding or receiving bribe"), Md. Crim. Law (formerly Art. 27, Section 22), as alleged in Count Two of the Information.

SO STIPULATED:

Derek E. Hines
Leo J. Wise
Assistant United States Attorneys

Cheryl Diane Glenn
Defendant

William Brennan, Esq.
Counsel for Defendant

20