IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**CHERYL DIANNE GLENN,**<br><br>**Defendant.** | **Criminal No. CCB 19-0351** |

**UNITED STATES RESPONSE**
**TO DEFENDANT GLENN'S SENTENCING MEMORANDUM**

The United States of America, by its undersigned counsel, hereby files this response to Defendant Cheryl Glenn's sentencing memorandum.

I.  **INTRODUCTION**

Former Delegate Cheryl Glenn accepted five bribe payments during an 11 month period in 2018 and 2019: April 4, 2018 ($3,000), August 23, 2018 ($5,000), October 22, 2018 ($5,000), December 10, 2018 ($5,000), December 20, 2018 ($750), and February 11, 2019 ($15,000). After Glenn solicited the first bribe, law enforcement became aware of her criminal conduct and engaged in this investigation.

She took these bribes in exchange for multiple official acts. She sold her office to those who could afford to pay for an advantage. Glenn put her own selfish financial interests ahead of the public interest and the interests of the constituents who had elected her and placed their trust in her.

The first bribe, in the amount of $3,000, was in exchange for multiple votes Glenn cast on House Bill 2, the "Natalie M. LaPrade Medical Cannabis Commission Reform Act," which increased the number of medical marijuana grower licenses from fifteen to twenty-two and

established a new cap of twenty-eight processing licenses.[1]  Glenn did this to benefit an *out-of-state* medical marijuana company that was seeking a license.

The second bribe, in the amount of $5,000, was in exchange for a written commitment to pursue legislation favorable to a business seeking a medical marijuana license in the next session of the Maryland General Assembly.[2]

The third bribe, in the amount of $5,000, was in exchange for pre-filing House Bill 35, which lowered the number of years of experience required for a medical director of an opioid clinic from three years of medical practice to two.  The Defendant did this without any concern that those who treat patients with addiction issues should have more experience, not less.

---

[1] House Bill 2 was pre-filed by Glenn on September 25, 2017, and introduced on January 10, 2018.  House Bill 2 initially passed the House by a vote of 121-16, with GLENN voting in favor, on March 8, 2018.  After amendments from the Senate, House Bill 2 passed the House by a vote of 118-15 on April 7, 2018, with Glenn voting in favor.  It was passed by the Senate on April 9, 2018, and approved by the Governor on May 15, 2018.

[2] The text of that written commitment is as follows:

> As it relates to the new licenses that will be available for minorities for medical marijuana in the State of Maryland, the issue of preferences for applicants who are residents of the State of Maryland has been a controversial conversation.  Many of the legislators believe that there should be a preference given to those applicants who are residents of the State of Maryland.  In the upcoming 2019 Legislative Session, there will be a strong effort to amend the law, as well as the regulations, so that preferences will be given to applicants for medical marijuana licenses who reside in the State of Maryland.  I will take the lead on the effort to get the law changed to provide the residency preference for the medical marijuana licenses.

The fourth and fifth bribe payments, in the amount of $5,000 and $15,000, respectively, were in exchange for the Defendant requesting the drafting of a bill to create a new liquor license in the 2019 session of the General Assembly.

The parties agree that the Defendant's advisory sentencing guidelines range of incarceration is 46-57 months.  There are no advisory sentencing guidelines issues in dispute.

## II.     ARGUMENT

The Defendant argues that a sentence of home confinement is sufficient but not greater than necessary to achieve the goals of sentencing.

It is not.

At the Defendant's sentencing hearing, for the reasons articulated below and for reasons that shall be articulated at that hearing, the United States will recommend a sentence of 36 months of incarceration.

The arguments the Defendant offers in support of her recommendation are unpersuasive.

### A. The Defendant Was a Politician At the Height of Her Powers When She Solicited and Accepted Five Bribes

The Defendant attempts to mitigate her conduct by asserting that "she succumbed to temptation offered by a person who she thought was a friend."  Def. Mem. at 12.

That is not true.

The Defendant actively solicited the bribes she took.  She did not "succumb to temptation," from Associate 1, whom the Government assumes is the "friend" the Defendant is trying to blame for her criminal conduct.

The bribery scheme described in the Defendant's plea agreement began, as described in the factual statement, at the Defendant's instigation. During a phone call between Glenn and Associate 1 on March 4, 2018, "GLENN told Associate 1 that she had an outstanding tax debt and GLENN and Associate 1 agreed that GLENN and Associate 1 would solicit money from Company 1 to pay the tax debt in exchange for agreeing to perform an official act." Plea Agreement at 11. Glenn chose to tell Associate 1 about her tax bill. She did it for the obvious reason that she hoped he would offer her money to pay it or, as they ultimately agreed, to help her solicit a bribe from Businessperson 1 and 2, who were representatives of a company that was trying to secure a new medical marijuana license in order to pay it. And that's exactly what they did. There is nothing in the factual records that suggests that Associate 1 "tempted" the Defendant. She chose to share her financial situation with him and agreed with him to solicit a bribe from a company that was seeking a medical marijuana license.

Later, pursuant to their plan, on March 5, 2018, the Defendant and Associate 1 met with Businessperson 1 and 2. At that meeting, "GLENN took a white, letter-sized envelope out of her purse and passed it to Associate 1." *Id.* at 11-12. It contained her property tax bill in the amount of $2,716. Glenn chose to do that. She didn't have to. She wasn't "succumb[ing]" to temptation. Associate 1 didn't put $3,000 on the table which she couldn't resist taking. She took an affirmative step, handing Associate 1 her tax bill, to get what she wanted, a $3,000 bribe payment.

Far from being someone who "succumb[ed] to temptation," Cheryl Glenn was a politician at the height of her powers when she took these bribes. Glenn was instrumental, perhaps uniquely so, in the creation of Maryland's medical marijuana industry. Her role was recognized by the fact that the official name of the Maryland Cannabis Commission is the

Natalie M. LaPrade Maryland Medical Cannabis Commission.  Natalie M. LaPrade is Cheryl Glenn's mother's name.  The website for the Commission contains the following statement about Delegate Glenn and her mother:

> Natalie LaPrade was the mother of Baltimore City Delegate Cheryl Glenn. Delegate Glenn was one of the leading sponsors of Medical Marijuana legislation. Mrs. LaPrade was born in Lynchburg, Virginia, in 1923.  She moved to Baltimore and raised her family there.  Mrs. LaPrade died of kidney cancer at the age of 87. She instilled in her children the importance of public service and helping others. Delegate Glenn believed that medical marijuana, if available, would have made her mother more comfortable and eased her pain in the last months and weeks of her life.

See www.mmcc.maryland.gov/Pages/aboutus.aspx (last viewed by author on 7/21/2020).

Further evidence that Glenn did not "succumb to temptation," and that she was, instead, activity seeking bribes was her statement to Associate 1 on June 18, 2018.  As described in the plea agreement, the Defendant asked Associate 1 if Businessperson 3, someone whom the Defendant understood wanted to obtain a marijuana license, was "going to be makin' a donation or something?"  The Defendant then explained why she was asking.  "I've stopped spending time with people if they're not um, donating to … you know what I mean."  In other words, you have to pay to play.

The Defendant also actively solicited the third bribe payment.  As described in the factual statement, on October 9, 2018, in a phone call, the Defendant told Associate 1, "Tell [Businessperson 3] I need s …, I need some help."  Evidently the $5,000 bribe payment she had already received purportedly from Businessperson 3 wasn't enough.  At a meeting on October 12, 2018, the Defendant showed Associate 1 documents that reflected changes proposed by the Cannabis Commission to Maryland's medical marijuana regulations as a result of House Bill 2. The Defendant told Associate 1, "I got this shit done," and "it took a lot of work" and "I fought

5

my ass off for this." In recognition of what she did, the Defendant wanted a $20,000 "personal loan," to "clear everything up."

The Defendant wanted this "loan," which obviously would never be repaid, because she felt she was owed it, a belief reflected in the question she posed to Associate 1: "Do you know how much somebody would charge [Businessperson 3] to give him all that shit?" Except Businessperson 3 shouldn't be charged for the work the Defendant was supposedly doing in the public interest. None of the work she did as a state legislator entitled her to extract cash from individuals to put in her own pocket.

The Defendant also accepted money from another individual who had business before the General Assembly, L.L. Specifically:

- On May 22, 2018, Glenn accepted $2,000 in money orders from L.L. at what purportedly was a fundraiser for Glenn and other politicians. These money orders were not campaign contributions.
- On September 19, 2018, L.L. gave Glenn $1,000 cash at his residence in Baltimore.
- On October 22, 2018, L.L. gave Glenn a Wells Fargo check for $1,500 outside of his mother's home. The check was issued from L.L.'s business and made payable to Glenn.

None of these payments were disclosed as campaign contributions or gifts by Glenn. L.L. was not a family member of Glenn's or a close friend. They were paid by a local businessperson seeking to gain favor with Glenn in the hopes that she would be able to take official action that would benefit him. This evidence, and more, further shows that prior to her solicitation of the

first bribe from Associate 1, Glenn accepted cash and checks from individuals who sought to pay for her influence in Annapolis.  This is further evidence that her conduct with Associate 1 was part of a pattern where the Defendant monetized her official position and it completely undermines the notion that her conduct was the fault of Associate 1.

### B. Glenn Was Motivated By the "Desire to Possess More Than She Needed or *Deserved*."

In her sentencing memorandum the Defendant poses the question, "Was [Glenn's] descent into criminality motivated by a desire to acquire or possess more than what she needed or deserved?"  Def. Mem. at 11.

The answer is unquestionably yes.

All that the Defendant was entitled to was her salary as a member of the Maryland House of Delegates.  But that wasn't enough.

The Defendant evidently believed she was entitled to more than her legislator's salary for her role in the genesis of this new sector of Maryland's economy.  Her own sense of her role was perhaps best captured in the stunningly arrogant statement she made to Businessperson 3 in her efforts to obtain a bribe from him, the efforts that ultimately resulted in the second bribe payment.  As described in the factual statement to her plea agreement, on June 12, 2018, Glenn met with Businessperson 3 at a restaurant in Baltimore.  Glenn told Businessperson 3 that she had previously created a bill that awarded a company a medical marijuana growing license and that other applicants were "pissed off" and asked, "who the hell do they know?  'Cause they didn't' have any high-priced lobbyists or anything."

Glenn told Businessperson 3, "I said they know God and Cheryl Glenn."

7

If one were writing a novel or a screenplay about a corrupt politician that would be the kind of dialogue a good writer might craft. Except that that Cheryl Glenn actually said that in an unscripted moment when she thought the only people listening were Associate 1 and Businessperson 3.

**C. In the Moments Before She Was Confronted by the FBI the Defendant Was Fabricating Evidence to Cover Her Tracks.**

In describing the circumstances of her swift downfall on February 11, 2019, the Defendant writes:

> Ms. Glenn was confronted with her criminal wrongdoing by law enforcement on Monday, February 11, 2019 at a location in Annapolis, Maryland. At that time Ms. Glenn could have outright denied that her conduct was criminal, attempted to obfuscate her role in the matter or otherwise endeavored to avoid the consequences of her actions. She did none of that.

Def. Mem. at 4.

The Defendant fails to tell the Court that she had been shown evidence of her wrongdoing during this confrontation. The Defendant had been recorded on video on multiple occasions accepting bribe payments. That was the evidence she would have faced at trial. The decision to fold her tent was a rational one in light of the high probability that she would be convicted.

But more importantly, the Defendant also fails to mention that immediately before she was confronted she engaged in one last act of obfuscation. As described in the factual statement to her plea agreement:

> On February 11, 2019, GLENN arranged to meet with Associate 1 at a hotel in Annapolis, Maryland so that Associate 1 could pay GLENN $15,000 in cash for introducing House Bill 347. When she arrived at the hotel, GLENN called Associate 1 and asked Associate 1 to come to her car. Associate 1 entered GLENN's car and GLENN proceeded to drive from the hotel at a high rate of

8

> speed to another nearby parking lot.  When GLENN parked the vehicle, GLENN said she needed Associate 1 to sign a document as "an insurance thing."  The document, drafted by GLENN, falsely stated, "To whom it may concern:  The money, $15,000.00, received from my friend, [Associate 1], this morning, is in NO way connected to my position as a State Delegate . . . I have not made any promises to use my position as a State Delegate for any purposes.  The money is a gift and is not being given to me in exchange for any political favors."  GLENN told Associate 1 that "this protects you and I."  GLENN proceeded to count stacks of cash and confirmed she received the full $15,000.00.

Plea Agreement at 18.  The Defendant did this of her own volition.  It was her idea and came as a complete surprise to law enforcement who were monitoring the meeting between the Defendant and Associate 1.  The Defendant and Associate 1 had never discussed creating such a document.  Why did she do it?  She was attempting to cover her tracks right up until the moment she was confronted with incontrovertible evidence of her wrongdoing.

   D. **The Defendant's Conduct Demands More Than a "Slap on the Wrist."**

In the section of her memorandum where the Defendant addresses the need to promote respect for the law and to provide adequate deterrence, she poses the following question: "what message can and should the Court send to deter others from similar conduct?"  Def. Mem. at 12.

The Court should look no further than the Defendant's own words.

In March 2017, the Maryland General Assembly's Joint Committee on Legislative Ethics reprimanded Baltimore County Delegate Dan Morhaim for failing to adequately disclose his ties to a medical marijuana company.  Morhaim was described in an article appearing in *The Baltimore Sun* as the "architect" of the medical marijuana industry in Maryland.  http://www.baltimoresun.com/politics/bs-md-morhiam-ethics-20170302-story.html (last viewed by author on 7/22/2020).  The same article then goes on to quote "the other delegate central to legalizing and expanding the medical marijuana industry," then-Delegate Cheryl Glenn.

The Defendant was quoted in that article as saying she was "alarmed and disappointed" that Morhaim was not facing harsher punishment. The article goes on:

> "He didn't do anything wrong? Oh, please," said Del. Cheryl Glenn, a Baltimore Democrat. "It's incredulous that all he's getting is a slap on the wrist. ... He definitely has used the power of his position as a legislator. Would Doctor's Orders have been interested in forming a financial relationship with him if he wasn't a lawmaker?"

And now Delegate Glenn is asking for a slap on the wrist for conduct that is far worse than failing to adequately disclose a business relationship.

More than home confinement is required to reflect the seriousness of the offense and to promote respect for the law. Recent public corruption cases against Baltimore officials including the prosecution of Senator Nathaniel Oaks and Mayor Catherine Pugh have all resulted in terms of incarceration. Former Senator Oaks was sentenced to 42 months incarceration. Former Mayor Pugh was sentenced to 36 months. Between the two, Delegate Glenn's conduct is more analogous to Senator Oaks's than Mayor Pugh's.

More than home confinement is required to deter Maryland politicians from taking bribes. Of particular note on this point is the prosecution of Senator Oaks. It occurred in 2017 and 2018, before the bribe payments the Defendant has admitted taking. Oaks and Glenn engaged in strikingly similar behavior—they both accepted cash in exchange for pre-filing legislation. During the recordings between the Defendant and Associate 1, she discussed that Oaks got caught because he dealt with someone he didn't know personally, and she acknowledged her awareness of the outcome of his case. Yet, Oaks's conviction and sentence of incarceration was not enough to deter then-Delegate Glenn. So what will it take to deter other politicians? Certainly not home confinement. Indeed, the Defendant's conduct, which again,

occurred after Oaks's, suggests longer terms of incarceration, not shorter ones, are necessary to achieve adequate deterrence.

### III. CONCLUSION

For all these reasons, and others that will be offered at the sentencing hearing, a sentence of 36 months incarceration is sufficient but not greater than necessary to address the goals of sentencing.

Respectfully submitted,
Robert K. Hur
United States Attorney

By: *[signature]* _____

Leo J. Wise
Derek E. Hines
Assistant United States Attorneys

### CERTIFICATE OF SERVICE

I hereby certify that this filing was served on defense counsel via ECF electronic filing.

By: *[signature]*

Leo J. Wise
Assistant United States Attorney